**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PERFORMANCE DESIGNED PRODUCTS LLC,<br><br>                      Plaintiff,<br><br>v.<br><br>OKYN HOLDINGS, INC., doing business as Nyko Technologies,<br><br>                    Defendant. | Case No.:  25-cv-01360-RBM-JLB<br><br>**TENTATIVE CLAIM CONSTRUCTION ORDER** |

The present action involves two consolidated patent cases.  In one, Performance Designed Products, LLC ("Plaintiff" or "PDP") seeks a declaration of non-infringement. (*See* Doc. 48 at 2.)  In the other, OKYN Holdings, Inc. ("Defendant" or "Nyko") asserts claims of patent infringement.  (*See id.* at 3.)  Both concern the same four patents: U.S. Patent Nos. 8,143,848 ("the '848 Patent"); 8,536,832 ("the '832 Patent"); 9,705,344 ("the '344 Patent"); and 9,174,121 ("the '121 Patent") (collectively, "the Asserted Patents").

On December 15, 2025, the Parties filed their joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2, identifying the disputed claim terms from the Asserted Patents.  (Doc. 35.)[1]  On January 26, 2026, the Parties each

---

[1]  Because the Asserted Patents "share [a] common specification," the Parties "have cited solely to the specification of the '848 Patent" for simplicity, except as otherwise noted. (Doc. 35-1 at 1.)

1

25-cv-01360-RBM-JLB

filed their opening claim construction briefs.  (Docs. 39, 40.)  On February 9, 2026, the Parties each filed their responsive claim construction briefs.  (Docs. 43, 44.)  A claim construction hearing is scheduled for April 28, 2026 at 1:30 p.m.  In anticipation of the hearing, the Court issues the following tentative claim construction order.

## I.   BACKGROUND

Nyko is the owner of the Asserted Patents.  (Doc 53 ("Nyko Compl.) ¶¶ 9–12.)  Each of the Asserted Patents "share[s]a common specification and [is] part of the same patent family," is titled "Video Game Controller Charging System Having a Docking Structure," and relates to "charging systems for consumer electronics devices, and more particularly to charging systems for hand-held video game controllers."  (*See* Doc. 1-2 at 27.)  The Asserted Patents are "charging station[s] capable of charging multiple video game controllers simultaneously."  *NYKO Techs. v. Energizer Holdings Inc.*, Case No. CV 12-3001 GAF (VBKx), 2013 WL 11232100, at *2 (C.D. Cal. Oct. 22, 2013).

PDP provides "third-party gaming peripherals, such as controllers, headsets, and accessories," and "is a preferred partner for each of the major gaming console providers, including Nintendo (Switch), Microsoft (X-Box), and Sony (PlayStation)."  (Doc. 1 ("PDP Compl.") ¶¶ 8–9.)  Nyko alleges that PDP infringed certain claims of each of the Asserted Patents through PDP's "Ultra Slim Charge System for PlayStation 4," which is a charging dock for the PlayStation 4 gaming console.  (Nyko Compl. ¶ 17.)

The Parties have agreed to constructions for six claim terms from the Asserted Patents.  (*See* Doc. 35-2 at 7–9.)  The Parties request that the Court construe nine disputed claim terms: "docking bay;" "a recess of a shape configured to mate with the adapter body;" "plurality;" "adapter;" "electrical contact(s)" / "electrical lead(s);" "video game controller;" "intervening portion;" "recess;" and "connector."  (*Id.* at 2–6; *see* Docs. 39, 40, 43, 44.)

## II.   LEGAL STANDARDS

Claim construction is an issue of law for the court to decide.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *Markman v. Westview Instruments, Inc.*,

25-cv-01360-RBM-JLB

517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary." *Teva*, 574 U.S. at 326.  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).  "It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id*. at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *O2 Micro*, 521 F.3d at 1360.  In those cases, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including intrinsic and extrinsic evidence. *Phillips*, 415 F.3d at 1314.  A court should begin with the intrinsic record, which consists of the language of the claims, the patent specification, and, if in evidence, the prosecution history of the asserted patent. *Id*.; *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

In determining the proper construction of a claim, a court should first look to the language of the claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself.").  The context in which a disputed term is used in the asserted claims may

provide substantial guidance as to the meaning of the term. *See Phillips*, 415 F.3d at 1314. In addition, the context in which the disputed term is used in other claims, both asserted and unasserted, may provide guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. A disputed term should be construed "consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *accord Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *see also Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning." (internal quotation marks omitted)). Moreover, "'[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.'" *Vederi*, 744 F.3d 1383.

A court must also read claims "in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 997 (Fed. Cir. 1995) (en banc); *see* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" *Vederi*, 744 F.3d at 1382 (quoting *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1272 (Fed. Cir. 2011)). For example, "a claim construction that excludes [a] preferred embodiment [described in the specification] is rarely, if ever, correct and would require highly persuasive evidentiary support." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (citation and internal quotation marks omitted).

But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 52 F.3d at 980. Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack,*

4

25-cv-01360-RBM-JLB

*Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence. *Phillips*, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ("PTO")] and includes the prior art cited during the examination of the patent." *Id*. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id*. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583; *Teva*, 574 U.S. at 331. However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. *Phillips*, 415 F.3d at 1319. "Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015) (citation omitted); *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history."). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that

extrinsic evidence." *Teva*, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro*, 521 F.3d at 1362. In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. *See id.*; *Phillips*, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361. If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. *Id.* at 1362; *accord Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016).

### III. DISCUSSION

Having considered the Parties' claim construction briefs and supporting evidence, the Court now tentatively construes the disputed claim terms as set forth below.

1. **"docking bay"**

| PDP Construction | Nyko Construction |
|---|---|
| "a physical component defining an opening for receiving and aligning controllers" | "a structure that matches the shape of the adapter and configured to guide and align a controller onto the base" |

PDP argues that its proposed construction aligns with the Parties' agreed-upon constructions and is supported by the specification and the plain and ordinary meaning of "bay." (Doc. 39 at 7–10.) Nyko argues that its proposed construction finds support in the claims and specification, and that PDP's proposed construction should be rejected as overly reliant on dictionary definitions inconsistent with the intrinsic evidence. (Doc. 40 at 21–23.) The Court tentatively finds that "docking bay" should be construed somewhere in between the Parties' proposals.

The Parties agree on the construction for two terms related to "docking bay." These are "structure," defined as "one or more physical components for receiving controllers,"

25-cv-01360-RBM-JLB

and "docking structure," defined as "one or more physical components for receiving and aligning controllers." (Doc. 35 at 6–7.) Based on these agreements, it appears that "docking" adds "aligning controllers" to the broader class of "structure." A "docking bay," then, should include that capability.

The Court tentatively disagrees, though, with PDP's construction to the extent "docking bay" should be construed to be "defining an opening." None of the claims recite an "opening" related to "docking bay." The specifications describe "[t]he docking bays 512, 514 . . . can have any suitable shapes that allow the electrical contacts of the docking bays . . . to make contact with the electrical leads . . . . (Doc. 40-2 ("'848 Patent") at 12:32–35.) Docking bays thus need not have an opening through which the controller is placed. PDP also argues that the specification's phrasing that controllers may be "received horizontally *into* one of the docking bays" demonstrates that a "docking bay" must have an opening. (Doc. 39 at 9 (emphasis added).) But as Nyko notes, "[i]n all relevant embodiments ('adapter' embodiments in FIGS 16–23), 'docking bay' is not shown to include an opening," and if "docking bay" were to be construed as having an opening, then "a user would not be able to simply drop a controller onto the docking bay. The user would need to precisely adjust or control the controller to put it into an opening/hole—a scenario in which the preferred embodiment . . . would be excluded." (Doc. 44 at 8–9.) "A claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'" *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (citation omitted). As such, the Court declines to construe "docking bay" as requiring an opening.

The Court also tentatively disagrees with Nyko's construction to the extent a "docking bay" should be construed to match the shape of the adapter. Nyko argues that claim 15 of the '344 Patent recites "docking bay defining a recess of a shape configured to mate with the adapter body," and the specification describes "[i]n other embodiments, the adapters 516 and the docking bays 512, 514 have matching shapes, such as, for example, a molded male and female matching shape." (Doc. 40-3 ("'832 Patent") at 17:18–20; '848 Patent at 12:29–31.) Here, the specification is describing preferred "embodiments" of the

invention. (*See also* '848 Patent at 11:49–50 ("Another exemplary embodiment of the invention, shown in FIGS. 16–23 . . . .").) "It is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc.*, 674 F.3d at 1327. Here, there is no language in the specification providing a clear indication that the invention should be limited to these embodiments. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). Indeed, the language at issue implies that there are "other embodiments" where the adapters and the docking bays do not have matching shapes. Second, Nyko's proposed construction would render the language of claim 15 superfluous. Substituting Nyko's proposed construction of "docking bay" into claim 15 yields the following redundancy: "a structure that *matches the shape of the adapter* and configured to guide and align a controller onto the base defining a recess of a *shape configured to mate with the adapter*." *See SimpleAir, Inc. v. Sony Ericcson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored") (citation omitted).

Finally, Nyko argues that the descriptions PDP relies on "concern[ ] a 'docking bay' in an embodiment that is not recited in the asserted claims." (Doc. 44 at 8.) But the context in which a disputed term is used in claims, both asserted and unasserted, provides guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. Nyko argues that certain embodiments include an "adapter" and others do not. But this does not overcome the Court's obligation to construe a disputed term "consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp.*, 274 F.3d at 1342.

Accordingly, the Court tentatively construes "docking bay" to mean: "a structure configured to receive and align controllers."

25-cv-01360-RBM-JLB

2.    **"recess"**

| PDP Construction | Nyko Construction |
|---|---|
| No construction required.  Alternatively, "an indentation or set back" | "a portion of the docking bay dimensioned to receive the adapter and having a shape that matches with the shape of the adapter" |

PDP argues that Nyko's proposal improperly narrows "recess," as "[t]he specification confirms that the 'recess' need not match the shape of the adapter." (Doc. 39 at 17.)  Nyko argues that the claims and specifications teach that the "recess" must have a shape that matches with the shape of the adapter, and PDP's argument does not consider the specification in context.  (Doc. 40 at 28; Doc. 44 at 10.)  The Court tentatively finds PDP's proposal more appropriate.

First, the Court notes that it appears PDP did not address Nyko's argument that the "recess" is "a portion of the docking bay."  The claim recites the charging system comprising a base that "comprises at least one structure defining a docking bay," ('848 Patent at 17:15–16), and "[e]ach of the docking bays 512, 514 includes a recess 530 at the bottom of the docking bay" ('832 Patent at 12:10–12).  (*See also id.* at 15:58–59 (claim reciting "the base has a recess formed therein . . .").)  The Court reads this language to mean that the "docking bay" may contain the "recess," but not necessarily that the "recess" must always be part of the "docking bay."  The Parties shall be prepared to address this issue at the hearing.

Second, the Court tentatively finds that the "recess" need not always be "dimensioned to receive the adapter and hav[e] a shape that matches with the shape of the adapter."  Not all the claims expressly recite as such.  (*See* '344 Patent at 18:28–30 ("at least one adapter is of a shape that generally coincides with the shape of the recess"); '848 Patent at 17:37–40 ("at least one recess comprises an angled corner dimensioned to match the angled edges of the at least one external adapter and adapted to orient the at least one external adapter with respect to the at least one recess").)  Additionally, there are claims that discuss the "recess" without also discussing how the "recess" is dimensioned to receive

9

the adapter. (*See* '848 Patent at 17:1–5 ("a base comprising at least one electrical contact, the base further comprising . . .").)  Therefore, Nyko's proposal would render the above claims superfluous, which is disfavored.  *See SimpleAir, Inc.*, 820 F.3d at 429.  Accordingly, the Court tentatively construes "recess" to mean "an indentation or set back."

3. **"mate / mated"**

| PDP Construction | Nyko Construction |
|---|---|
| "a recess of a shape configured to fit or interlock together with the adapter" / "when the adapter body and recess are fitted or interlocked with one another" / "the adapter is fitted or interlocked with the recess" | "recess" and "adapter" should be construed separately.  The remaining phrases do not require construction. |

PDP requests that the Court construe the term "mate / mated" in the context of several of the claims. (Doc. 39 at 18.)  The claim language at issue recites: "a recess of a shape configured to *mate* with the adapter body" / "when the adapter body and recess are *mated* with one another" / "the adapter is *mated* with the recess." (Doc. 35-1 at 26.)  PDP appears to ask the Court to construe "mate / mated" to mean "fit or interlock."  (*See id.*)  Nyko argues that, aside from construing "recess" and "adapter" separately, which the Court has tentatively done above, the remaining terms or phrases do not require construction. (Doc. 40 at 27–28.)

The Court tentatively finds that the term "mate / mated" does not require any further construction.  "[M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004); *Alltech, Inc. v. Cenzone Tech, Inc.*, No. 06 CV 0153 JM (RBB), 2007 WL 5793393, at *5 (S.D. Cal. Jan. 4, 2007) (declining to "construe 'modified' as simply 'altered'" because "[t]his construction merely substitutes one word for another without clarifying the disputed term's meaning").

25-cv-01360-RBM-JLB

#### 4.     **"plurality"**

| PDP Construction | Nyko Construction |
|---|---|
| "three or more" | "two or more" |

The Federal Circuit has "held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary." *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327–28 (Fed. Cir. 2001) (citing *York Prods, Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996) ("The term means, simply, 'the state of being plural.'")).  The Court tentatively finds no "indication to the contrary" sufficient to overcome plurality's well-accepted meaning here.

PDP argues that the specification "states that Figures 8, 9, and 10 show power adapters having a 'plurality' of DC, USB, and/or FireWire Ports," and that each Figure shows three or more ports.  (Doc. 39 at 25.)  PDP argues further that Nyko has used the specific language of "two" or "at least two" when it intended to claim "two or more," and as such has defined plurality to mean "three or more" by implication.  (*Id.* at 25–26 (citations omitted).)  Nyko argues that "plurality" is recited to modify the components "adapter" and "docking bay," and the specification describes an embodiment where there are two "adapters" and "docking bays."  (Doc. 40 at 27.)

Claims 1 and 13 recite a "plurality of docking bays."  (*See* '848 Patent at 15:44; 16:35–36.)  Figures 16 and 17 are described as: "The docking bays 512, 514 are dimensioned to accept adapters 516."  ('848 Patent at 11:57–59.)  Therefore, contrary to PDP's argument, Nyko does use "plurality" to describe two things, *i.e.*, the two docking bays 512 and 514.  The cases cited by PDP do not command otherwise.  In *Bell Atlantic*, the patentee used a claim term "in a manner consistent with only a single meaning."  262 F.3d at 1271.  And in *Performance Business Forms, Inc. v. Reynolds and Reynolds Co.*, the term "plurality" was used to describe "layered form blanks," "sheets of copy-producing medium," "form blanks," and "subajacent forms blanks."  No. 3:03-0931, 2005 WL 1868894, at *11 (M.D. Tenn. Aug. 3, 2005).  The specifications and patent drawings

11

referring to each of these items revealed at least three of each of these items, which led the court to construe "plurality" as "more than two." *Id.*  For the reasons just stated above, that is not the case here.  The Court tentatively construes "plurality" to mean "two or more."

5.  **"electrical contact(s) / electrical lead(s)"**

| PDP Construction | Nyko Construction |
|---|---|
| "a portion that electrically connects [one component to another] except for plug/port style connections" or "a physical component that permits current flow between conducting parts that are in physical contact, except for plug/port style contacts | Electrical lead: "a physical contact type structure, not a mechanical one as a connector would require, that allows for the flow of electric current when physically contacted by the electrical contact"  Electrical contact: "a physical contact type structure, not a mechanical one as a connector would require, that allows for the flow of electric current when physically contacted by the electrical lead" |

"The parties appear to agree that Nyko disclaimed the full scope of these terms," and "[t]he core of their dispute is the scope of that disclaimer—whether, as Nyko contends, it disclaimed *all* mechanical contact type structures, or, as PDP contends, only plug/port style connections." (Doc. 39 at 26 (emphasis in original).)  *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) ("[E]ven in the case of an unequivocal disavowal of claim scope, the court must construe the claim 'congruent with the scope of the surrender.'").  PDP argues that "nowhere does Nyko disclaim *every* mechanical connection," which means that "the disclaimer of electrical leads/contacts must be limited to plug and port style connections." (*Id.* at 27 (emphasis in original).)  PDP also argues that construing these claims to cover all mechanical connections would broaden Nyko's disclaimer beyond what is clear from the prosecution history.  The Court tentatively adopts most of Nyko's proposed construction.

25-cv-01360-RBM-JLB

The prosecution history aligns more closely with Nyko's proposed construction. (*See, e.g.*, Doc. 40-10 at 5 ("the term 'contact,' in light of the specification, requires a physical contact type structure for establishing continuity of the circuit and not a mechanical one as a connector would require. . . . A 'contact' requires a physical contact type structure.' 'Contacts' and 'leads' do not include pin connections and ports."); Doc. 40-11 at 9 ("as acknowledged in the previous reexamination as well as in the current proceeding, ports and connectors were distinguished from contacts and leads").) "Patent examiners are presumed to be persons of ordinary skill in the art in the relevant technical field," *Wi-Lan USA, Inc. v. Alcatel-Lucent USA, Inc.*, No. 12-23568-CIV, 2013 WL 4811233, at *18 n.9 (S.D. Fla. Sept. 9, 2013) (citing *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003)), and "[s]tatements made by the examiner relating to how he or she understands a certain term are thus intrinsic evidence to which the court may refer when construing terms." *Realtime Data, LLC v. Morgan Stanley*, 875 F. Supp. 2d 276, 284 (S.D.N.Y. 2012).

The Court disagrees with PDP's argument that the examiner's opinion conflicts with Nyko's actual disclaimer. (*Compare* Doc. 39-7 at 9 (Nyko "disclaim[ed] . . . pin connections from electrical leads and contacts.") *with* Doc. 39-6 at 9 ("the claimed 'electrical leads/contacts' exclude ports or connectors that fit together to make a male-female connection").) Nyko's disclaimer reads:

> the *contact* created by the 'electrical leads' and 'electrical contacts' does not involve 'matching plugs or ports that fit together to make' a male-female pin connection. . . . Claim 25 *does not . . . require any type of port or connector* to establish the claimed 'contact' between the 'electrical leads' and 'electrical contacts.' Thus, the claims themselves suggest that *the 'electrical leads/contacts' are not ports or connectors* and that the *contact* between the 'electrical leads' and 'electrical contacts' *excludes a male-female pin connection*.

(Doc. 39-6 at 9–10 (emphasis added).)

The Court interprets this language to be Nyko disclaiming both "pin connections" and "ports or connectors." Furthermore, the specification contains disparaging remarks regarding the use of ports or connectors. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d

1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature.").  For example, "[t]his recharging process is fast and easy as the adapter 516 allows the controller 526 to be simply dropped into place, *rather than carefully connected to a fragile port or connector*."  ('848 Patent at 13:18–19 (emphasis added).)  And finally, each of the "electrical leads" 522 located on the bottom side of the adapter 516 is configured to physically contact the corresponding "electrical contact" 520 of the base 510.  (*See* '848 Patent at Figure 16.)  As Nyko explains, this physical contact "does not require any pin connection, but only requires a physical *contact* to allow the flow of electric current from 'electrical contact' to 'electrical lead.'"  (Doc. 40 at 12 (citing '848 Patent at 11:59–62) (emphasis in original).)

In light of the intrinsic evidence's support of Nyko's proposed construction, and the fact that PDP cites to no intrinsic evidence in support of its proposed construction, the Court tentatively construes "electrical lead" as "a physical contact type structure that allows for the flow of electric current when physically contacted by the electrical contact, but not including pin connections, connectors, or ports."  The Court tentatively construes "electrical contact" as "a physical contact type structure that allows for the flow of electric current when physically contacted by the electrical lead, but not including pin connections, connectors, or ports."

6.    **"adapter"**

| PDP Construction | Nyko Construction |
| --- | --- |
| No construction necessary.  Alternatively, "a device for connecting parts that otherwise would not connect" | "(a) a physical piece having a body that is configured to mount on the surface of a controller, (b) to not interfere with controller operation during game play, and (c) to allow direct charging of controller batteries when a controller is dropped on the base" |

Nyko argues that the three elements in its proposed construction "are essential to

defining the meaning of 'adapter'" because the elements "make an 'adapter' suitable for achieving its intended purpose (e.g., fast and easy charging of a controller)." (Doc. 40 at 17.) Nyko also argues that each of these elements are supported by the intrinsic evidence, including language in the specification and Nyko's arguments during the reexamination of the Asserted Patents. (*Id.* at 18–21.) PDP argues that "adapter" needs no construction because it is not ambiguous, uncommon, or highly technical, and proposes "a device for connecting parts that otherwise would not connect" in the alternative. (Doc. 39 at 11.) PDP also argues that Nyko's proposed construction: (1) relies on mere descriptions of exemplary embodiments; (2) ignores other parts of the specification, and other claims, that use the term "adapter" in contexts inconsistent with the three proposed elements; and (3) is not supported by the reexamination history. (Doc. 43 at 7–9; Doc. 39 at 12–14.) The Court tentatively agrees with PDP and tentatively finds PDP's alternative proposed construction appropriate.

Nyko relies on several portions of the specification to support its proposed construction for "adapter." Specifically, it cites to figures 16–23 and portions of their corresponding descriptions in the specification, which Nyko contends shows an "adapter" that is configured to be physically mounted on the controller, that does not interfere with the operation of a controller during game play, and that allows fast and easy charging when a controller is dropped on the base. (Doc. 40 at 17–19.) But the specification makes clear that these figures represent only embodiments of the invention. (*See* '848 Patent at 11:49–50 ("Another exemplary embodiment of the invention, shown in FIGS. 16-23 . . . ."; '832 Patent at 5:57–60 (Figures 19C and 20, among others, are views of an "adapter" and "charging station" "according to an exemplary embodiment of the invention").)

And "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc.*, 674 F.3d at 1327. Here, there is no language in the specification providing a clear indication that the invention should be limited to these embodiments. *See*

25-cv-01360-RBM-JLB

*Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer."); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification.").

Nyko's proposed construction would also render certain claim language superfluous. For example, claim 25 of the '848 Patent recites "the adapter is removably attachable on the video game controller and configured to remain attached on the video game controller when the video game controller is in use during operation of a video game." ('848 Patent at 18:23–26.) Claim 1 of the '344 Patent recites "the adapter may remain attached to the video game controller when the video game controller is in use during the operation of a video game." ('344 Patent at 16:15–18.) Calling out in the claim that the adapter is configured to remain attached on the video game controller when the video game controller is in use would be unnecessary if Nyko was correct that the "adapter" already encompasses those requirements. Thus, the claim language already provides the specificity Nyko seeks, and Nyko's proposed construction would render that claim language superfluous. *See SimpleAir, Inc.*, 820 F.3d at 429.

Nyko also argues that the reexamination history supports its proposed construction. (*See, e.g.*, Doc. 40-18 at 18 (arguing that the Asserted Patents "disclose the adapter as being 'small and light weight' such that it does not interfere with operation of the controller while the adapter is attached on the controller").) Through such arguments, Nyko sought to distinguish the prior art adapter from the claimed adapter. But as PDP argues, this attempt to distinguish prior art is based on "claim limitations regarding the adapter—not on the definition of 'adapter.'" (Doc. 43 at 8.) Therefore, the Court tentatively adopts PDP's proposed construction – "a device for connecting parts that otherwise would not connect."

7.   **"video game controller"**

| PDP Construction | Nyko Construction |
| --- | --- |

16

25-cv-01360-RBM-JLB

| No construction necessary. "video game controller" is a limitation of the asserted claims. | A "video game controller" is not a required component of the claimed invention, only a recitation of the intended environment with which the claimed invention is to be used or the capabilities of the claimed invention. |
| --- | --- |

The Parties agree that "video game controller" appears in both the preamble and the claims: "[a] video game controller charging system for charging a video game controller having a power input port, the video game controller charging system comprising: . . . an adapter comprising a connector configured to couple to the power input port of the video game controller . . . ." ('848 Patent at 18:13–24.) Although the Parties also dispute the construction of "video game controller," it appears that their primary dispute is whether "video game controller" is a limitation of the claimed system or merely a description of the claimed environment for the claimed system. (*See* Doc. 39 at 20; Doc. 40 at 25.) PDP argues that "video game controller" "provides antecedent basis for that term through the claims" and "define[s] the charging system 'in a way that depends on [the] physical characteristics' of the video game controller," therefore making "video game controller" a limiting feature of the claims. (Doc. 39 at 20–22 (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)) and citing *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *18 (E.D.N.Y. Nov. 2, 2017)).) PDP also argues that Nyko advocated that "video game controller" was a limitation of the claims during the reexamination of the Asserted Patents. (*Id.* at 23–24.)

Nyko argues that it "is not arguing that the preamble is not limiting here," just that "'video game controller' is *not part* of the claimed invention because it 'limit[s] only the claimed environment, not the claimed . . . system.'" (Doc. 40 at 24–25 (quoting *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1375 (Fed. Cir. 2011)).) Furthermore, Nyko argues that its statements during the reexamination of the Asserted Patents do not amount to a clear and unmistakable disavowal of claim scope. (*Id.* at 7–8 and n.2.) The Court tentatively declines to construe "video game controller" and tentatively finds that "video game controller" limits only the claimed environment, not the

17

claimed system.

There is no dispute that "video game controller" is limiting here. (*See* Doc. 40 at 25 ("Nyko is not arguing that the preamble is not limiting here.").) *See also Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1370–71 (Fed. Cir. 2020). But the Asserted Patents describe a "video game controller *charging system*." Although "video game controller" may be part of the description of the environment in which the claimed invention operates, it is not part of the claimed invention itself. *See Fiserv, Inc.*, 641 F.3d at 1373–75; *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794–95 (Fed. Cir. 2010)). In *Fiserv*, the plaintiff held a patent on check security technology that decrypted information that was printed on the surface of checks. 641 F.3d at 1371–72. The preamble described the patent as "[a] process for validating a negotiable financial instrument" on which information "is encrypted . . . to generate a control code which is printed on the financial instrument." *Id.* at 1373. The Federal Circuit determined that an infringer would not need to encrypt or print financial instruments to infringe the patent because the preamble language merely described the "environment in which an accused infringer must act or . . . capabilities that an accused device must have." *Id.* at 1374. Similarly here, the claimed charging system must be capable of charging a "video game controller" in the manner recited by the preamble and the claims, but the "video game controller" is not itself part of the claimed charging system. *Accord Info. Protection v. Symantec Corp.*, CIVIL ACTION NO. 2:08-CV-484, 2011 WL 13136605, at *5–6 (E.D. Tex. Nov. 14, 2011).

Unlike in *Fiserv*, the disputed term, "video game controller," appears not just in the preamble, but also throughout the claims. For example, claim 25 recites: "video game controller charging system comprising: . . . an adapter comprising a connector configured to couple to the power input port of the video game controller . . . a docking structure configured to receive the video game controller . . . ." ('848 Patent at 18:13–24.) Still, the language of the claims supports the Court's tentative finding. In analyzing similar claim limitations, the Federal Circuit found that "[t]he language 'configured to' in the claims indicates that the subsystem must be *capable* of using the claimed method," not that the

18

claims "require performance of the method steps." *In re McFadden*, 2025 WL 2553720, at *4 (Fed. Cir. Sept. 5, 2025) (emphasis in original).  Here, the claims recite that various parts of the claimed invention shall be "configured to" the "video game controller."  Thus, the adapters and docking structures of the charging system must be capable of coupling to or receiving a video game controller, but the charging system does not itself include a video game controller.

The language in the preamble and claims here is dissimilar to that found in *Bicon* or *Veeco*.  In *Bicon*, the Federal Circuit considered a claim covering a dental implant:

> An emergence cuff member[,] for use in preserving the [subject's gums] during the procedure of placing an abutment on a root member implanted in the alveolar bone of a patient in which [a] the abutment has a frustro-spherical basal surface portion and [b] a conical surface portion having a selected height therefrom[,] comprising . . . [various structural features, including] . . . [e] a bore . . . having a taper generally matching that of the canonical surface portion of the abutment. . . .

441 F.3d at 948.

The patent holder argued that the claimed invention was solely the "emergence cuff," and that the rest of the preamble did not limit the claim because it merely "set[ ] forth the purpose or use of the emergence cuff."  *Id.* at 949–50.  "The problem with [the patent holder's] argument is that, because claim 5 includes a detailed description of the abutment's physical characteristics and defines the emergence cuff in a way that depends on those physical characteristics, the invention . . . can only be understood as being limited by the abutment recited in the claim."  *Id.* at 950.  "Despite the fact that the claim begins with a reference to the emergence cuff alone, the full text of the claim, read in the context of the entire patent, indicates that the claimed invention is *the combination of* the emergence cuff and the abutment, operating together in the fashion recited in the claim and described in the specification."  *Id.* at 952.  Here, the charging system is not defined in a way that relies on the physical characteristics of the "video game controller."  *Id.* at 950.  Indeed, there is no "description of the [video game controller's] physical characteristics" in the claims at all, much less a "detailed" one that would help define the charging system.

25-cv-01360-RBM-JLB

*Id.* Additionally, neither the claims nor the specification indicate that the invention is the combination of the charging system and the video game controller. *Cf. id.* at 948, 951 (construing the invention as solely the emergence cuff would read out multiple detailed limitations of the abutment and its characteristics from the claim).

PDP's argument under *Veeco* does not fare better. There, the district court found that a claimed invention was limited by the requirement of a "rotatable spindle." *Veeco*, 2017 WL 5054711, at *18. Although the description of the invention did not "include a detailed description" of the spindle's physical characteristics, the court considered *Bicon* controlling because the invention was limited by the physical characteristics of the spindle. *Id.* (noting that the claim defines the invention as "having a central recess adapted for detachably inserting an upper end of said rotatable spindle"). On first glance, this language appears analogous to the language used to describe the charging system. As Nyko notes, however, the specification in *Veeco* actually spoke of the invention "as having multiple aspects," one of which was "an apparatus . . . [that] *includes* a reaction chamber, *a rotatable spindle*, a hearing means . . . ." *Id.* at 4 (emphasis added). Moreover, one of the claims in *Veeco* recited: "[a]n apparatus for supporting and transporting at least one wafer in a CVD reactor *having a rotatable spindle*, . . . ." *Id.* at *5 (emphasis added). Therefore, the court in *Veeco* had evidence that the claimed invention was "the combination of" the apparatus and the rotatable spindle. *Bicon, Inc.*, 441 F.3d at 952. Such evidence is not present here.

Finally, PDP argues that Nyko argued that "video game controller" was a limitation of the claimed invention during the reexamination of the Asserted Patents. PDP points to the following language in the reexamination history:

> In sum, using the [prior art] cellular phone as a video game controller would render [the prior art] inoperable for its intended purpose and change the principle of operation of [the prior art] . . . . [The prior art] fails to teach or suggest the claimed 'video game controller,' as recited in claim 25.

(Doc. 39-9 at 31.)

> The limitation that the adapter is configured to remain attached on the video game controller when the controller is in use is a substantive limitation and

20

25-cv-01360-RBM-JLB

not merely a statement of intended use.

(Doc. 39-8 at 7.)

"The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344 (Fed. Cir. 2015) (citation omitted).  Courts do not apply this prosecution disclaimer doctrine, though, "where the alleged disavowal of claim scope is ambiguous" or "amenable to multiple reasonable interpretations." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

As discussed above, the Court tentatively finds that the claimed charging system must involve a "video game controller" in the manner recited by the preamble and the claims, but that "video game controller" is not part of the claimed charging system.  The language in the reexamination history does not compel a contrary conclusion.  Nyko argued that "[the prior art] is not intended to work with a video game controller," which is consistent with the Court's tentative construction here.  Additionally, the fact that the adapter must be configured to remain attached on the video game controller is "a substantive limitation," but only of the adapter.  In any event, Nyko's arguments during the reexamination cannot be considered an unequivocal disavowal of claim scope such that prosecution disclaimer should be applied in the manner proposed by PDP.

In summary, the Court tentatively finds that "video game controller" is a limitation of the claimed environment rather than the claimed invention.  It also tentatively finds that "video game controller" needs no construction, as it "is used in common parlance," "has no special meaning in the art," and "the plain and ordinary meaning" is clear. *Summit 6*, 802 F.3d at 1291.

8.   **"intervening portion"**

| PDP Construction | Nyko Construction |
| --- | --- |
| "a physical component separate from and disposable between the base and the video game controller" | No construction required.  Alternatively, "a physical component that includes the adapter" |

25-cv-01360-RBM-JLB

The Parties agree that evidence related to "intervening portion" is scarce.  The term does not appear in the specification and is not discussed substantively in the prosecution history.  It is only recited in claims 1, 3, 4, and 11 of the '121 Patent:

> each of the intervening portions comprises an adapter . . . .

> DC ports are indirectly connectable to the base through the intervening portions.

> the intervening portions are removably connectable to the base.

> each of the adapters comprises at least one electrical lead configured to contact and electrically connect the respective one of the DC ports to the at least one electrical contact when the intervening portion is received in the respective recess.

(Doc. 39-5 ("'121 Patent") at 15:48–50, 62–64, 65–67; 17:8–10.)

The Court tentatively finds that "intervening portion" needs no further construction because the phrase's plain and ordinary meaning is discernible from the claims above. *Accord Microbes, Inc. v. Espoma Co.*, No. 2:09-CV-237-CE, 2011 WL 1375608, at *21 (E.D. Tex. Apr. 12, 2011) ("Neither proposed construction "will assist the jury in evaluating the claim language—both constructions merely reorganize the claim language.").

### 9.   **"connector"**

| PDP Construction | Nyko Construction |
| --- | --- |
| No construction necessary.  Alternatively, "a structure for electrically and mechanically joining one item to another" | "a plug or port (male or female) having pins that mechanically fits together with a counterpart plug or port (male or female)" |

Nyko argues that the claims and the specification "explicitly differentiate the 'connector' from the 'electrical leads/contacts'" and, as such, "connector" must not include a physical contact type structure.  (Doc. 40 at 14–15.)  Nyko argues that the claims recite that the "connector" is configured to couple to the power input port of the video game controller, which requires that the "connector" itself be a port or plug having pins that is configured to mechanically fit together with the port of the controller.  (*Id.* at 15.)

22

Furthermore, Nyko argues, all the embodiments for the "connector" include a male-female pin connector that is configured to mechanically fit together with a counterpart connector. (*Id.* at 15–16.)  PDP argues that "connector" need not be construed.  (Doc. 39 at 27.) Alternatively, because the claims recite that a "connector" is "configured to removably and *electrically couple* the adapter to the power input port of the video game controller, *thereby mechanically mounting* the body of the adapter to the video game controller," PDP argues that its proposal is correct. (*Id.* at 27–28 (emphasis in original).)  Furthermore, PDP argues that the specification describes several types of "connectors" that provide both mechanical and electrical connections. (*Id.* at 28.)  The Court will defer construing this term until after the hearing, as it has concerns regarding both proposed constructions.

Nyko's proposal finds significant support in the specification.  For example, the specification describes "a connector that is configured to connect to the power input port of the accessory device to be charged.  In one embodiment, the connector 542 is a male mini-USB . . . connector adapted to connect to a female mini-USB connector on a hand-held controller . . . ." ('848 Patent at 12:58–60.)  And according to Nyko, "[i]n order to be coupled to the power input port, the 'connector' itself must be a port or plug having pins that is configured to mechanically fit together with the port of the controller." (Doc. 40 at 15.)  The specification also refers to "ports" or "plugs" when describing "connectors," which provides further support that a "connector" is a port or plug. (*See, e.g.*, '344 Patent at 9:63–67 ("the DC ports 408 are male mini-USB (universal serial bus) connectors . . . .").) Extrinsic evidence also supports Nyko's proposal.  The Microsoft Computer Dictionary entry for "connector" includes: "Most connector types are available in one of two genders—male or female.  A male connector is characterized by one or more exposed pins; a female connector is characterized by one or more receptacles—sockets or jacks—designed to accept the pins on the male connector." (Doc. 40-14 at 5.)  The Collins Dictionary defines "connector" in electrical engineering as "the part on a cable or an appliance that has female contact pins and is intended to be attached to the end of the flexible cable remote from the supply." (Doc. 40-15 at 3.)

25-cv-01360-RBM-JLB

However, claim 15 of the '344 Patent recites "a connector fixed to the body and configured to removably *and electrically couple* the adapter to the power input port of the video game controller, thereby mechanically mounting the body of the adapter to the video game controller." ('344 Patent at 18:9–11 (emphasis added).)    Additionally, the specification describes "the DC *ports* 408 may be *any electrical connectors* suitable for coupling to a video game controller." ('848 Patent at 39–42 (emphasis added).)  Thus, it appears that Nyko's proposal, which only covers "mechanically fit[ting] together," may exclude a preferred embodiment.

At the same time, PDP's construction, although it covers both "electrically and mechanically joining," appears both too narrow in light of the discussion above and too broad in terms of what may be interpreted as "mechanically joining."  Accordingly, the Court tentatively finds that neither proposal is a proper construction. The Court will reconsider its position after the hearing.

### III.   CONCLUSION

The Court hereby tentatively adopts the constructions set forth above.

**IT IS SO ORDERED.**

DATE:  April 27, 2026

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

25-cv-01360-RBM-JLB